**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

UNITED STATES OF AMERICA,

                **Plaintiff,**

v.                                 **No. 10-20219-JPM-cgc**

DONNELL FROST, SR.,

                **Defendant.**

## REPORT AND RECOMMENDATIONS ON DEFENDANT'S MOTION TO SUPPRESS AND ON DEFENDANT'S MOTION TO RECONSIDER ORAL RULING AT SUPPRESSION HEARING OR ALTERNATIVELY SECOND MOTION TO SUPPRESS

Before the Court is Defendant Donnell Frost, Sr.'s ("Defendant") Motion to Suppress (D.E. #23) and Motion to Reconsider Oral Ruling at Suppression Hearing or Alternatively Second Motion to Suppress (D.E. #29). The Motion to Suppress was referred to United States Magistrate Judge Charmiane G. Claxton for Report and Recommendation (D.E. #24). For the reasons set forth herein, the Court RECOMMENDS that Defendant's Motion to Suppress (D.E. #23) be DENIED and that Defendant's Motion to Reconsider Oral Ruling at Suppression Hearing or Alternatively Second Motion to Suppress (D.E. #29) be GRANTED IN PART as to the request for reconsideration AND DENIED IN PART as to the requests to suppress evidence.

### I. Introduction

On May 25, 2010, Defendant was indicted on one count of being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Defendant filed a Motion to Suppress on September 3, 2010 alleging that the warrantless search of Defendant's home was unlawfully

1

conducted without consent or exigent circumstances.  The United States responded on September 16, 2010 that the warrantless search was lawful because Defendant orally consented to the search of his residence.

On October 12, 2010, the Magistrate Judge held a hearing on Defendant's Motion to Suppress.  At the hearing, Defendant raised an additional issue based upon testimony provided at the hearing that any purported oral consent given was invalid because it was not unequivocally given when Defendant refused to provide written consent.  (Oct. 12, 2010 H'rg Tr. ("Tr.") at 80). Although the Motion to Suppress had only addressed whether or not the Defendant consented, not whether or not the Defendant's consent was valid, the United States did not specifically object to this argument at the hearing.  (Tr. at 85-86).  Additionally, Defendant argued for the first time that, based upon the testimony presented, Defendant's warrantless arrest was unlawful.  ( Tr. at 80).  The United States objected that this argument was not presented in the Motion to Suppress and that it was beyond the scope of the hearing.  (Tr. at 80-81).  The Magistrate Judge concluded that the newly raised unlawful arrest issue was beyond the scope of the Motion to Suppress and advised Defendant's counsel that he could file a new motion alleging these issues; however, the Magistrate Judge allowed Defendant's counsel to present his argument regarding the unlawful arrest in the record.  (Tr. at 81-82).

On October 19, 2010, Defendant filed a Motion to Reconsider Oral Ruling at Suppression Hearing or Alternatively Second Motion to Suppress, which requested that the Court address whether any purported consent was voluntary and whether the arrest was lawful in its Report and Recommendation. (D.E. #29).  On December 1, 2010, the Magistrate Judge held a status conference with the parties and instructed them to advise the Court within one week of the Motion to Suppress

2

hearing transcript being filed in the record if additional testimony would be needed to properly consider all issues presented.  (D.E. #33).  The Official Transcript was filed on December 6, 2010, and neither the Defendant nor the United States indicated that further testimony would be necessary.

On December 23, 2010, Defendant filed his Post-Hearing Memorandum in Support of Motion to Suppress.  Defendant asserts that he was unlawfully arrested and that the firearm obtained following the illegal arrest should be suppressed.  Defendant further asserts that he did not consent to the search of his residence and that any purported consent was not voluntarily and unequivocally given.

On January 31, 2011, the United States filed its Post-Hearing Memorandum in Opposition to Defendant's Motion to Suppress.  The United States argued that exigent circumstances existed to justify the warrantless arrest of the Defendant in the threshold of his home.  Specifically, the United States argues that the officer's response to the reports of violence in the form of shots fired at a minor child falls under the hot-pursuit-of-a-fleeing-felon exception to the warrant requirement.  Additionally, the United States argues that officers were authorized to search the Defendant's residence without a warrant because Defendant provided valid oral consent authorizing the search.

**II.  Motion for Reconsideration of Oral Ruling**

Initially, the Court will address Defendant's Motion for Reconsideration of Oral Ruling.  Because the issues of the voluntariness of consent and the lawfulness of the arrest were not presented in the original Motion to Suppress, the Court initially advised that it would not make any recommendations to the District Judge on these issues.  However, following the December 1, 2010 status conference, the Magistrate Judge afforded both parties the opportunity to advise if any further testimony would be necessary for these issues to be properly considered by the Court.  Neither

Defendant nor the United States advised that further hearings would be required to make a complete record for the Court's consideration. Further, both Defendant and the United States have addressed the issues of the voluntariness of consent and the lawfulness of the arrest in their Post-Hearing Memoranda. Accordingly, the Court RECOMMENDS that the District Court consider the arguments raised both in Defendant's Initial Motion to Suppress as well as the arguments later raised in open court and in Defendant's Second Motion to Suppress.

### III. Motion to Suppress

### A. Proposed Findings of Fact[1]

On January 10, 2010, Donnell "D.J." Frost, Jr., the minor son of Defendant, went to his family's home at 4248 Navaho Street in Memphis, Tennessee. (Tr. at 9, 11-12, 14, 22). Although D.J. lived at this residence, he had been staying at his aunt's house over the previous weekend following his suspension from school. (Tr. at 7-8, 14-15). D.J. had informed his mother of the suspension but had not informed his father. (Tr. at 14). His father "found out within the streets" that D.J. had received a suspension and had "been looking for him." (Tr. at 55). D.J. returned home

---

[1] Defendant initially argues that the Court should accredit his testimony over the testimony of Officer Hendree and Officer Archie. Although there are certain inconsistencies between Officer Hendree and Officer Archie's recollections of the events, which will be addressed individually as necessary, the Court finds that Defendant has brought his own credibility in this matter into serious question by his own actions. Aside from Defendant's previous nine felony convictions that are proper grounds for his credibility to be impeached (Tr. at 70-71) and his repeatedly stated motivation that he does not "want to go to jail" for what he believes will be at least ten years (Tr. at 60, 64, 71, 73), Defendant has admittedly attempted to subvert justice in this case by asking both Anderson and his minor son that was the victim of his admitted violence to claim that the firearm belonged to them. (Tr. at 13, 53). Specifically, Defendant stated that he told Anderson that "they could have took the charge" and that he told his employer that his "son and his mother are going to provide a statement, saying that the gun is not his and that they had lied." (Tr. at 63, 71-72). Thus, because the Defendant has admitted to dishonesty in this case, the Court declines to accredit Defendant's testimony over Officer Hendree, Officer Archie, or the other witnesses.

stating that he needed to get some clothes for school before returning to his aunt's house, and as he was leaving, he took his mother's cell phone.  (Tr. at 7-8, 16-17, 36, 49, 55).

Defendant became agitated with his son for taking his mother's phone, and they got into a physical fight where both of them were "punching" and "slamming" and D.J. was "slammed . . . on the ground."  (Tr. at 8, 36).  D.J. admits to threatening his father, saying that he and his brother are "gonna get" him.  (Tr. at 17, 56).  At some point, D.J. was able to break away from the fight, retain the phone, and begin walking down the street.  (Tr. at 9, 36).  Defendant proceeded to go into the residence and returned outside inquiring in profane terms about D.J.'s whereabouts.  (Tr. at 17).  When D.J. looked back towards his home, Defendant had a gun in his hand and fired one shot.  (Tr. at 7, 9, 17-18, 36).  Defendant states that he did not fire the gun at his son but instead into the air to "threaten him," "to scare him" into "doing the right thing," to "wake him up," and to teach him not to disrespect his father and mother, although he previously had stated to officers that he did so to "protect himself."  (Tr. at 56-57). However, D.J. states that the Defendant pointed the gun directly at him and shot at him.  (Tr. at 9, 17-18).  As the Court has already concluded that Defendant's testimony lacks credibility, the Court accredits D.J.'s version of events.

Although D.J. was unharmed by the gunshot, he ran from his home and reported the incident to the police.  (Tr. at 17-18).  Officer Guy Hendree, Officer James Archie, and Officer Evans of the Memphis Police Department reported to the armed party call and initially arrived at an intersection west of the residence where D.J. advised he would be waiting.  (Tr. at 7, 9, 22-23, 26-27, 35-36, 45).  D.J. provided a further account of what had transpired, including the nature of the argument, the physical altercation, and the shooting.  (Tr. at 27, 36).  The officers considered this to be a "pretty dangerous situation" and instructed D.J. to wait at his location down the street while they proceeded

5

to the residence.  (Tr. at 18, 23, 27-28).

When the officers arrived at the home, they parked their vehicles down the street so as not to alert Defendant of their presence for safety reasons, and they approached a side door of the residence on foot.  (Tr. at 27-28, 37, 55).  Officer Hendree approached with his gun drawn, Officer Archie was further behind without his weapon drawn, and Officer Evans was at the back.  (Tr. at 28, 37, 40-41, 45).  Officer Hendree knocked on the side door of Defendant's residence and announced the presence of police, at which time Defendant answered the door.  (Tr. at 23-24, 28-29).  When Defendant opened the door, Officer Hendree "grabbed" him and underwent a "very brief struggle" in the threshold area of the residence, with each of them "wind[ing] up" partially inside and partially outside the home.  (Tr. at 29-30).  Once detained, Defendant was handcuffed and placed in the back of a police car.  (Tr. at 23-24, 28-29, 49).  Officer Hendree stated that they arrested Defendant because they "received prior knowledge from his son that he was armed with a firearm and had actually shot at him earlier in the evening."  (Tr. at 24).  Once Defendant was under arrest, officers contacted D.J. and asked him to return to the scene, and he arrived at the home to see his father in the police car and his mother in the kitchen.  (Tr. at 9-10, 18-19).

One of the officers approached Anderson with "paperwork" and asked for her consent to search the residence.  (Tr. at 10-11, 19).  Anderson advised that the residence belonged to Defendant and that they would have to obtain his consent to search the residence.  (Tr. at 10-11, 19, 30-31, 50, 52).  The officers went outside to where Defendant was under arrest in the squad car, and they returned stating that "he said it's okay to search the house."  (Tr. at 11, 20, 51-52)  Officer Hendree and Officer Archie confirmed that the Defendant gave verbal consent to search his residence and that Defendant insisted that "he didn't have any firearms, he didn't fire no shots, and that we could

search his house all we wanted."  (Tr. at 24-25, 32, 34, 37-39, 46).[2]  However, Defendant refused

to sign any written consent form.  (Tr. at 32-33).  Although Defendant denies that he gave oral

consent, the Court accredits the testimony of Officer Hendree and Officer Archie, which is

corroborated by D.J. and Anderson's testimony that they heard the officers on the scene return to

the residence indicating that Defendant had consented.  Once consent was obtained, Officer Hendree

searched the residence and located a firearm between the mattress and box spring of Defendant's

bed.  (Tr. at 25).   D.J. and Anderson both confirmed the gun the located belonged to Defendant.

(Tr. at 12).

### B. **Proposed Conclusions of Law**

### 1. *Lawfulness of Warrantless Arrest*

First, the Court will consider whether the arrest of Defendant in the threshold of his home

was constitutionally permissible.  The standard for determining whether seizure of a person has

occurred—and whether the Fourth Amendment is thus implicated— is provided in United States v.

Mendenhall, 446 U.S. 544, 554 (1980), which set forth as follows:

> [A] person has been 'seized' within the meaning of the Fourth Amendment only if,
> in view of all the circumstances surrounding the incident, a reasonable person would
> have believed that he was not free to leave.  Examples of circumstances that might
> indicate a seizure, even where the person did not attempt to leave, would be the

---

[2]  Defendant asserts that Officers Hendree and Archie should not be found credible as to
whether Defendant provided oral consent because Officer Hendree recalled that the oral consent
was provided while Defendant was in the squad car and Officer Archie stated that he "can't
really remember" but believed it occurred while Defendant was outside of the house and before
he had been placed in the squad car.  (Tr. at 24, 39, 41-42).  Although the officers' recollection
differs about the location of the consent, the officers both testified that he provided oral consent
and that he made specific statements denying having a firearm and denying firing shots.   (Tr. at
24-25, 32, 34, 37-39).  Thus, the Court finds that their differing recollections of the precise point
that Defendant made these statements is not significant enough to discredit the officers' detailed
account of Defendant's oral consent.

threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

Id.

Once implicated, the Fourth Amendment protects the individual's privacy in a variety of settings.  Payton v. New York, 445 U.S. 573, 589 (1980).  "In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their . . . houses . . . shall not be violated.'"  Id. at 589 (quoting U.S. Const. amend. IV).  That language unequivocally establishes the proposition that at the very core of the Fourth Amendment "stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion."  Id. at 589-90 (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)).  "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house."  Id. at 590.  "Absent exigent circumstances, that threshold may not be reasonably crossed without a warrant."  Id. at 590.

"The term 'exigent circumstances,' in conjunction with an arrest in a residence, refers to a situation where the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action."  United States v. Flickinger, 573 F.2d 1349, 1355 (9th Cir. 1978) (cited by United States v. Morgan, 743 F.2d 1158, 1162 (6th Cir. 1984)).  "A determination of whether exigent circumstances exist to justify a warrantless entry and seizure requires that the court consider the totality of the circumstances and the inherent necessities of the situation at the time."  United States v. Plavcak, 411 F.3d 655, 663 (6th Cir. 2005).  Although the Sixth Circuit has noted that "it is not possible to articulate a succinct yet exhaustive list of circumstances that qualify as 'exigent,'"

8

there are four general categories in which warrantless entries are justified: "(1) hot pursuit of a fleeing felon; (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others." United States v. Rohrig, 98 F.3d 1506, 1515 (6th Cir. 1996) (quoting United States v. Johnson, 22 F.3d 674, 680 (6th Cir. 1994)).  The burden rests upon the government to demonstrate the existence of exigent circumstances sufficient to except law enforcement from complying with the warrant requirement.  Morgan, 743 F.2d at 1162.

In the instant case, the United States asserts that the warrantless arrest was proper pursuant to the "hot pursuit of a fleeing felon" exception to the warrant requirement as established by the Supreme Court in Warden v. Hayden, 387 U.S. 294 (1967) and United States v. Santana, 427 U.S. 38 (1976).  See Rohrig, 98 F.3d at 1515.  "[T]he 'hot pursuit' exception is reserved for situations where speed is essential to protect a compelling governmental interest."  Morgan, 743 F.2d at 1162 (citations omitted).

In support of their assertion that sufficient exigent circumstances existed in the instant case to justify the warrantless arrest, the United States relies upon United States v. Bass, 315 F.3d 561 (6th Cir. 2002), United States v. Holland, 511 F.2d 38 (6th Cir. 1975), and United States v. Harris, No. 05-5267, 2005 WL 3448282 (6th Cir. Dec. 15, 2005).  In support of the contrary position, Defendant relies upon United States v. Saari, 272 F.3d 804 (6th Cir. 2001) and United States v. Morgan, 743 F.3d 1158 (6th Cir. 1984).  Because of the highly factual nature of the totality-of-the-circumstances inquiry, the Court will briefly address the facts of these cases before analyzing the instant case.

### a. *Authorities Cited by the United States*

The Court begins with a brief summary of the cases that the United States argues are

9

analogous to the present case. In <u>Bass</u>, officers received a report of a disturbance at an apartment complex. 315 F.3d at 562-63. Within one minute of the call, officers arrived on the scene and were informed by the complainant that she had witnessed a male "fire several gunshots at two other men . . . and then flee into an upstairs apartment" that she was able to point out. <u>Id.</u> at 563. Officers approached the identified apartment and knocked on the door. <u>Id.</u> A female answered and informed the officers that her children and her husband, Bass, were at the residence. <u>Id.</u> Two officers then "entered the residence without permission and commanded the man to appear." <u>Id.</u> When Bass "exited the bedroom, the officers brought him into the apartment's living room and handcuffed him." <u>Id.</u> The Sixth Circuit determined that the warrantless arrest of Bass in his residence was justified as a hot pursuit of a fleeing felon and as a risk of danger to the police or others. <u>Id.</u> at 564. Specifically, the Sixth Circuit reasoned that, because the suspect had fled into the residence "only minutes before" the arrival of law enforcement officers, that it was "reasonable for the police to enter that apartment to locate both the suspect and any weapon that might be used either against them or against other people in the apartment complex." <u>Id.</u> (citing <u>Hayden</u>, 387 U.S. at 298-99).

In <u>Holland</u>, officers received a report of a bank robbery with a description of the suspect. 511 F.2d at 39. A detective arrived at the scene shortly after the police received the alarm and noticed footprints in the snow that "were pretty decent strides," that appeared to be made by a person running, and that had a "rare heel" that had a "pretty sharp cut back." <u>Id.</u> at 40. The footprints led to a driveway where it appeared from the melted snow that a vehicle had been sitting. <u>Id.</u> After being joined by another officer, the detective questioned the female occupant of the house, who informed them that her son had just left with his children. <u>Id.</u> The officers proceeded to the son's residence, where the detective recalled an "earlier observation which he had made but had not then

related to the bank alarm"—specifically, that he had seen a vehicle with two men as he was responding to the bank. Id. at 41. When he asked the son if he had another man in his vehicle, he replied that he had his relative, Henry Gross, who was known to the officers for his criminal record. Id. Officers then proceeded to Gross's residence and a total of eight police officers surrounded the house. Id. at 42. When officers went to the front door, a female answered, identified herself as Gross's sister, stated that Gross was not there, and refused to allow officers to enter even after they explained that they were investigating whether Gross was present at a bank robbery. Id. Officers then heard a "noise that appeared to be something falling down" coming from the upstairs of the house, and they informed Gross's sister that they "are going to have to come in and search" for Gross. Id. Several officers entered the house, went upstairs, located Gross, and handcuffed and arrested him. Id. at 43. Officers further observed an attic door "which was closed on the outside by bent nails which had been turned over" and, upon opening the attic, found another man, Holland, lying on the attic floor with a gun. Id. Holland was also arrested and found to have bullets on his person. Id. Officers stated that the duration of the investigation—from the time the detective left the bank until the officers arrived at the Gross residence—lasted approximately twenty to thirty minutes. Id. at 42.

Upon review in Holland, the Sixth Circuit stated that the warrantless arrest at issue "is not without difficulty in constitutional terms." Id. at 44. However, the Court found that because the police "had positive knowledge that a violent crime had been committed" and more than probable cause to believe that the suspect was in the home, the Fourth Amendment was not violated. Id. at 44-45. Further, even though the defendant argued that the police "should have maintained surveillance and dispatched some part of their force for an arrest or search warrant," the Sixth

11

Circuit concluded that, "[u]nder the circumstances of this case, we do not agree that this procedure was mandated by the Federal Constitution."  Id. at 45.[3]

### b. Authorities Cited by Defendant

In support of the Motion to Suppress, Defendant relies upon Morgan and Saari for the proposition that the motion should be granted.  In Morgan, officers received a complaint about individuals target shooting into a clay bank at a public park.  743 F.3d at 1160.  As officers approached the park, they "heard what sounded like automatic weapons being fired" and saw five or six people loading firearms into the trunk of a vehicle.  Id.  Officers approached the individuals, told them they had received a complaint about gunfire, and asked the group to leave, which the individuals agreed to do.  Id.  However, as the group was preparing to leave, another person approached the officers and told them that their trunk was "filled with machine guns, pistols and shotguns" and advised that if they attempted to arrest the group, "these people will shoot you."  Id.  The officers left the park and radioed a description of the vehicle, which was later reported to have arrived at a residence.  Id.  Officers monitored the residence and observed "no unusual or threatening

---

[3]  The Government further relies upon Harris as support that exigent circumstances exist in this case.  However, in Harris, the Defendant concedes that the entrance into the residence that had an open door, was in disarray, and had evidence of a violent altercation including fist-sizes holes in the walls and blood stains, was justified by exigent circumstances, specifically that "there is a need for officers to protect themselves and others against the risk of harm from both the victim and the suspect in a domestic dispute."  2005 WL 3448282, at **5.  The issue before the Sixth Circuit did not pertain to any in-home arrest of a suspect but instead presented the question of whether a later alleged re-entry into the residence that resulted in the discovery of a firearm was justified by exigent circumstances.  Id. at **3.  While the Harris court found that exigent circumstances existed to justify the officer's search of the residence, it did not specifically address the hot-pursuit-of-a-fleeing-felon exception.  Id. at **4-**6.  Yet, even though the circumstances are distinguishable, the Sixth Circuit reiterated that, "with domestic disputes there is a need to protect themselves and others against the risk of harm from both the victim and the suspect."  Id. at **3.

activity around the house." Id.  Other officers met at a coffee shop to assess the situation and plan the logistics of approaching the house.  Id.  Ultimately, nine officers went to the home, drove one car into the yard with the lights off, pulled behind the suspect's vehicle to block any exit, and then flooded the house with spotlights and summoned the defendant from the home with the "blaring call of a bullhorn."  Id. at 1161.  Responding to the coercive activity outside, the defendant appeared at the door with a pistol, was directed to put down the weapon, and after complying, was arrested, handcuffed, and frisked, at which time another weapon was recovered from his person.  Id. Approximately one to two hours passed from the first observation of the suspects to the defendant's arrest, during which time "no effort was made by any law enforcement agency to obtain a search or arrest warrant."  Id.

Upon review in Morgan, the Sixth Circuit initially considered whether the coercive efforts to require a suspect to exit his home to be placed under arrest effectively constituted an arrest in the home under Payton.  Id. at 1166.  The Sixth Circuit relied upon United States v. Johnson, 626 F.2d 753 (9th Cir. 1980), which held that an arrest of a suspect "while he stood within the door of his home" implicated the Fourth Amendment.  Id. at 757.  The Morgan court agreed with the Johnson court's reasoning that, when a suspect is arrested as he stood inside his home and is surrounded by officers with drawn weapons, "it is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home."  Id. at 757; see Morgan, 743 F.2d at 1166. Thus, "[a]lthough there was no direct police entry" into the home prior to the arrest, "the constructive entry accomplished the same thing."  Id. at 1166.  Accordingly, the warrantless arrest of the suspect "as he stood within the door of a private home, after emerging in response to coercive police conduct," implicated the Fourth Amendment protections of Payton.

13

Additionally, the Sixth Circuit determined in Morgan that there were no exigent circumstances justifying the warrantless arrest of the defendant. Id. Specifically, the Court concluded that there was no urgent need for immediate action and that the officers were not responding to the type of emergency that justified proceeding without a warrant. Id. at 1162. Critical to that determination was the finding that there "was no substantiated evidence that [the defendant] was dangerous or that a grave offense or crime of violence had occurred or was even threatened." Id. at 1163 (citing United States v. Killebrew, 560 F.2d 729, 734 (6th Cir. 1977). Accordingly, the Court determined that the defendant was unlawfully arrested and that the subsequent seizure of the firearm was illegally obtained and, thus, properly suppressed. Id. at 1168.

In Saari, officers responded to a "shots fired" call at the residence of the defendant's ex-wife. 272 F.3d at 806. Officers spoke with the victim, who advised that shots were not actually fired but that the defendant was "observed standing in her window with what appeared to be a pistol in his hand." Id. The victim informed officers that the defendant "was armed at all times." Id. Additionally, law enforcement received information that the defendant was alleged to belong to a militia group and to be "heavily armed" and in possession of explosives. Id. Four officers with weapons drawn surrounded the defendant's apartment and approached the front door. Id. at 806-07. Officers knocked and announced their presence, the defendant answered the door, and he was ordered to come out of the apartment. Id. at 807. The defendant was asked if he had a weapon, and he informed the officers that he had a gun in the waistband of his pants. Id.

Upon review in Saari, the Sixth Circuit was presented with the limited question of whether the suppression of the firearm seized from the defendant's waistband was proper. The Sixth Circuit concluded that suppression of the firearm was appropriate and that this case was "in all relevant

14

respects, indistinguishable from <u>Morgan</u>." <u>Id.</u> at 808.  Specifically, the officers summoned the defendant to exit his home with "such a show of authority" that the defendant "reasonably believed that he had no choice but to comply." <u>Id.</u> at 809.  Thus, the conduct "constituted a constructive entry and in-home arrest," which is impermissible under <u>Payton</u> absent exigent circumstances.  <u>Id.</u>  Further, the <u>Saari</u> court concluded that no exigent circumstances existed, especially because "the police did not observe [d]efendant doing anything suspicious" and they were not "responding to a swiftly developing situation." <u>Id.</u>  Thus, the Court concluded that the arrest was unlawful and the suppression of the firearm was appropriate.

### c. Analysis of Lawfulness of Warrantless Arrest

As set forth above, the inquiry into whether an arrest violates the Fourth Amendment generally begins with the question of whether the Fourth Amendment's protections are implicated. However, the United States does not dispute that Defendant was placed under arrest in the threshold of his residence; thus, it is not contested that the protections of the Fourth Amendment apply.  Thus, while the narrow circumstances of the arrest itself are most analogous to the cases cited by the Defendant, in that police conduct coerced Defendant to come to the door of his residence and to be arrested in the threshold area, the totality of the circumstances of the encounter—and critically, the reports of violence in the form of shots fired at a child in as a result of a domestic disturbance in a public place—is more analogous to the cases cited by the United States.

Specifically, officers in this case were responding to a report of a physical altercation between the Defendant and his son, as well as a report of a shot fired at the son outside of their home in a residential area.  Thus, this case is highly distinguishable from <u>Morgan</u> and <u>Saari</u>, where the Sixth Circuit considered the warrantless arrests of individuals that were reported to be heavily armed

15

but were not reported to have engaged in violence.  See Morgan, 743 F.2d at 1163 ("There was no substantial evidence that [the defendant] was dangerous or that a grave offense of violence had occurred or was even threatened."); Saari, 272 F.3d at 810 ("Defendant was peaceably occupying his home when the officers arrived, and there was no proof that anyone was being threatened . . . .") Instead, the exigencies presented in this case are similar to Holland, Harris, and Bass, in which law enforcement officers were all responding to reported violence.  Just as the Sixth Circuit explicitly noted the lack of violence reported in Morgan and Saari in their reasoning that the warrantless arrest in the home was barred by Payton, the Sixth Circuit noted the fact that the "police had positive knowledge that a violent crime had been committed" along with "clear and convincing evidence" that the suspect was inside the home as grounds for upholding the warrantless arrest of the suspect in his home in Holland.  See 511 F.3d at 45.  Furthermore, even though the officers could have elected to obtain a warrant before proceeding, under such circumstances, the Sixth Circuit has concluded that the Fourth Amendment does not require such a course of action.  Id.

Further, the facts presented in the instant case are strikingly analogous to the circumstances considered by the Sixth Circuit in Bass.  Both cases involve reports of gunfire directed at certain individuals in public, residential areas.  Both cases involve the retreat of the suspect into a location identified by the witnesses.   In Bass, the Sixth Circuit concluded that the officers' entrance into the specified residence without consent to locate the person alleged to be responsible for the violence was appropriate.  The Court believes that this case necessitates the same conclusion. Accordingly, the Court RECOMMENDS that the District Court conclude that the arrest of Defendant in the threshold of his residence was justified by exigent circumstances and did not violate the Fourth Amendment.

16

## 2. *Consent to Search*

Next, Defendant asserts that he did not consent to the search of his residence and that, if the Court were to accredit the testimony that he did orally consent, that his consent was invalid because it was not voluntary and unequivocal.  It is well-recognized that a search conducted pursuant to valid consent is an exception to the Fourth Amendment's warrant requirement.  Schneckloth v. Bustamonte, 412 U.S. 218 (1973).  To satisfy this exception, the consent must be voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.  See United States v. Worley, 193 F.3d 380, 385 (6th Cir. 1999); United States v. Salvo, 133 F.3d 943, 953 (6th Cir. 1998) (quoting United States v. Taylor, 956 F.3d 572, 573 (6th Cir. 1992)).  The consideration of whether such consent was given "is a question of fact to be determined from the totality of the circumstances."  Schneckloth, 412 U.S. at 227.  The government bears the burden of establishing valid consent by a preponderance of the evidence through clear and positive testimony.  United States v. Mendenhall, 446 U.S. 544 (1980); Worley, 193 F.3d at 385 (citations omitted).

The Court has accredited the testimony of Officer Hendree, Officer Archie, Linda Anderson, and D.J. that the Defendant did provide consent to search.  Thus, the sole consideration is whether the consent was voluntary and unequivocal.  Defendant relies upon Worley and United States v. Buckingham, 433 F.3d 508 (6th Cir. 2006), for his assertion that it was not.  In Worley, when the suspect was approached at an airport and asked to provide consent to search his bags, he replied, "'[Y]ou've got the badge, I guess you can.'"  193 F.3d at 383.  The Sixth Circuit determined that this response was not an unequivocal expression of free and voluntary consent, but instead was "an expression of futility in resistance to authority."  Id. at 384.  In Buckingham, the suspect of a traffic stop initially provided oral consent to search his vehicle, then orally withdrew his consent, and then

17

executed a written consent form.  433 F.3d at 510-11.  Because the District Court only considered

the initial oral consent and did not consider its withdrawal or the subsequent written consent, the

Sixth Circuit remanded for further consideration.  Id. at 513-14.  However, Defendant asserts that

the Buckingham court noted that factors such as drawn weapons, numerous officers and vehicles

with flashing lights, and the suspect's reasonable belief that he was not free to leave the scene might

suggest involuntariness.  Id. at 514.

Upon review, the Court finds that this case is distinguishable from Worley and Buckingham.

Specifically, there is no indication in the record, as was present in Worley, that Defendant believed

that he had to consent to law enforcement, thus rendering his consent merely an expression of

futility.  Defendant does not state at any point that he felt that he had to consent due to the presence

of law enforcement or the circumstances of his arrest.  Instead, Defendant's additional statements

insisted upon his innocence and essentially challenged officers to locate the firearm he had hidden.

Once the officers retrieved the firearm after a search of his bedroom, Defendant admitted that he had

attempted to hide the gun between the mattress and box springs of his bed, and he further admitted

that this location was different from the "several spots" where he "normally" kept his firearm,

including "hid up under the dresser."  (Tr. at 69).  Defendant also recanted his professions of

innocence and confessed that he possessed and fired the weapon.  Thus, while it may be true that

Defendant's responses reflect what he characterizes as "the mask of false bravado," they do not

render his otherwise valid oral consent to be invalid.

Likewise, the Buckingham court was presented with a case where a defendant orally

consented, then orally withdrew consent, then consented in writing.  However, the instant case does

not present a situation where there was any attempt to withdraw or equivocate consent.  Specifically,

when Officer Hendree was asked whether Defendant at any point indicated that the officers did not have consent to search, he replied that he did not.  (Tr. at 34).  Even though Defendant declined to put his oral consent in writing, a "refusal to execute a written consent form subsequent to a voluntary oral consent does not act as an effective withdrawal of the prior oral consent."  United States v. Buckingham, No. 1:04-CR-10015-T, 2006 WL 1174471, at *7 (W.D. Tenn. Apr. 30, 2006) (citing United States v. Lattimore, 87 F.3d 647, 651 (4th Cir. 1996)).  Finally, though at least three officers were present at the scene and Defendant was not free to leave, officers did not obtain consent while their weapons were drawn, nor did they force, threaten, or coerce Defendant into providing consent. (Tr. at 25-26, 29).  Thus, the Court finds that these facts do not render Defendant's consent invalid.  Accordingly, considering the totality of the circumstances, the Court finds that Defendant voluntarily and unequivocally provided valid oral consent to search his residence to Officers Hendree and Archie.  Therefore, the Court RECOMMENDS that the District Court conclude that the search of Defendant's residence based upon consent did not violate the Fourth Amendment.

## IV.  Conclusion

For the reasons set forth herein, the Court RECOMMENDS that Defendant's Motion to Suppress (D.E. #23) be DENIED and that Defendant's Motion to Reconsider Oral Ruling at Suppression Hearing or Alternatively Second Motion to Suppress (D.E. #29) be GRANTED IN PART as to the request for reconsideration AND DENIED IN PART as to the requests to suppress evidence.

**DATED** this 14th day of March, 2011.

s/ Charmiane G. Claxton
CHARMIANE G. CLAXTON
UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT.  28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**